UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK                    Civ. No.:
-------------------------------------------------------------------X
DANA A. BRYANT,

                          Plaintiff,

                                                 **COMPLAINT**

              -against-

                                                 Plaintiff Demands a
NEW YORK UNIVERSITY, individually and d/b/a      Trial by Jury
NYU LANGONE MEDICAL CENTER,

                          Defendant.
-------------------------------------------------------------------X


Plaintiff, Dana A. Bryant, by and through her attorneys, PHILLIPS & ASSOCIATES, PLLC,

hereby complains of the Defendant, upon information and belief, as follows:

## NATURE OF THE CASE

1. Plaintiff complains pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.

   §2000e et. seq. ("Title VII"), the Americans with Disabilities Act ("ADA"), and to remedy

   violations of the New York Executive Law and the Administrative Code of the City of New

   York based upon the supplemental jurisdiction of this Court pursuant to *Gibbs*, 38 U.S. 715

   (1966) and 28 U.S.C. §1367, seeking damages to redress the injuries Plaintiff has suffered as

   a result of being harassed and discriminated against by her employer on the basis of her

   disability and/or perceived disability, race, and sex/gender, together with sexual harassment,

   creating a hostile work environment, retaliation, and unlawful termination.


## JURISDICTION AND VENUE

2. The Court has jurisdiction pursuant to 42 U.S.C. §2000e et. Seq.; 42 U.S.C. §12101 et. Seq.;

   28 U.S.C. §1331, §1343 and supplemental jurisdiction thereto.

3. This action involves a Question of Federal Law.

4. Venue is proper in this district based upon the fact that a substantial part of the events or omissions giving rise to the claim occurred within the Southern District of the State of New York.  28 U.S.C. §1391(b).

5. On or about May 17, 2018, Plaintiff received a Notice of Right to Sue Letter from the EEOC.

6. This action is being brought within ninety (90) days of said Notice of Right to Sue letter.

## PARTIES

7. Plaintiff is an African American female resident of the State of New York, County of Queens.

8. Plaintiff suffers from anxiety, depression, and Spasmodic Dysphonia, a voice disorder that causes the muscles in her throat to contract and spasm involuntarily and affects the sound of Plaintiff's voice.

9. At all times material, Defendant NEW YORK UNIVERSITY, individually and d/b/a NYU LANGONE MEDICAL CENTER (hereinafter "NYU") is a private, non-for-profit education corporation which maintains an academic medical center located in New York City and is duly incorporated under the laws of the State of New York.

10. At all times material, Plaintiff was an employee of Defendant NYU.

## MATERIAL FACTS

11. On or about August 16, 2016, Plaintiff began working for Defendant NYU as a "Part-Time Library Assistant."

12. In or around early September 2016, an NYU security guard approached Plaintiff while she was exiting the restroom and said, **"I just wanted to tell you how beautiful you are.  Can I take you out sometime?"** Plaintiff replied that she was in a relationship and returned to her desk.

2

13. In or around mid-September 2016, as Plaintiff was walking by the surveillance area, in reference to Plaintiff, one security guard shouted to another guard, "I will talk to her after she gets her hair done!"  The second guard laughed.

14. In or around September 2016, while Plaintiff was seated at her desk, a maintenance employee requested the use of a USB port by her desk to charge his cell phone.  When he returned for his phone, the same employee exclaimed, "She's ugly!" to a nearby security guard.

15. In or around October 2016, Plaintiff was walking by the main security desk when she overheard a female security guard talking to two male security guards.  In reference to Plaintiff, the female security guard stated, "But I thought you guys liked her?" One guard replied, **"From the bottom down, but not from the top up!"**

16. In or around October 2016, Plaintiff noticed that whenever she walked by the main security desk, the security guards would stare and laugh at her.  Plaintiff overheard a female guard ask, "Why don't you just leave her alone?" A maintenance employee in a gray hospital uniform said, **"It's funny and everyone needs a good laugh every now and then."**

17. In the beginning of October 2016, because of the ongoing harassment and comments based on her appearance as a woman, Plaintiff began to suffer from panic attacks and severe migraines.

18. On or about October 17, 2016, Plaintiff called in sick and sought medical treatment for another migraine.  **Plaintiff's doctor told her that the headaches were stress related and recommended that she seek counseling**.

19. From in or around November through December 2016, Plaintiff suffered from gastrointestinal problems from the stress of the hostile work environment.  In fact, she made several trips to Defendant's pharmacy to purchase medication.

20. On or about November 3, 2016, Plaintiff overheard a security guard state, **"I guess she only talks to white boys,"** after he witnessed Plaintiff's Caucasian male partner pick her up from work.

21. In or around December 2017, Plaintiff witnessed one security guard nudge another when Plaintiff came into their line of view. The second guard replied, "I don't feel like making fun of her today. I'm tired."

22. In or around January 2017, Plaintiff was forced to take a detour and walk by Defendant's security office because of construction in the building. Plaintiff walked by three security guards. In a flirtatious tone, one of the security guards stated, "Leaving so soon?" Plaintiff ignored him and continued walking. As Plaintiff was returning to her desk, the same security guard exclaimed, in an attempt to intimidate her, "Look at me when I am talking to you!" The other guards laughed in response.

23. In or around January 2017, Plaintiff began counseling for her anxiety, depression, and panic attacks related to the harassment at work.

24. On or about January 21, 2017, a security guard asked Plaintiff if he could print from one of the library's computers. Plaintiff explained that the library was "paperless" and any printers available were for library staff use only. Angered by Plaintiff's response, the guard replied, "Anyone can tell that's a weave" in reference to Plaintiff's hair.

25. On or about January 25, 2017, Plaintiff reported the harassment to her supervisor and Defendant's Branch Manager, Ashley Curran. In turn, Ms. Curran reported Plaintiff's complaint to Defendant's Assistant Director, Aileen McCrillis.

26. The following day, Plaintiff met with Ms. Curran to discuss the incidents of harassment. Plaintiff asked Ms. Curran if there was an alternate exit in the building to bypass the security desk.  Ms. Curran stated, "Yes, but you shouldn't have to use it."

27. On or about January 31, 2017, Plaintiff's partner was admitted into Defendant's hospital for surgery and was hospitalized for several days.

28. The next day, Plaintiff visited her partner at Defendant's hospital.  While Plaintiff was leaving to go home, she overheard one security guard tell another, **"[Plaintiff] comes to work every day with a busted weave."**

29. On or about February 2, 2017, Plaintiff was accompanied by her male cousin when she visited her partner in the hospital.  Plaintiff walked by a few security guards and overheard them say, **"She brought a real 'nigga' to work this time.  I wonder which one is her boyfriend?"**

30. On or about February 8, 2017, Plaintiff met with Evelyn Taveras, Defendant's Human Resources Manager.  Plaintiff told Ms. Taveras that the harassment had become more frequent and expressed concern that some of the security guards might have learned of Plaintiff's complaint.  Ms. Taveras quickly dismissed Plaintiff's concerns and stated that Plaintiff should email her if the harassment continued.   During the conversation, Plaintiff asked about transferring to another NYU location.  Ms. Taveras replied that she would look into it, but Ms. Taveras never contacted Plaintiff again regarding the transfer.

31. Because Plaintiff did not know the names of her harassers, Ms. Taveras casually mentioned giving Plaintiff a photo ID line up of the security guards but never actually offered the lineup for Plaintiff.

32. Later that day, Plaintiff and her mother visited Plaintiff's partner at Defendant's hospital. Plaintiff was carrying her cell phone in her hand and walked in front of several security guards

5

when one of them nastily stated, **"She better not be taking pictures of us,"** in an effort to intimidate Plaintiff for her harassment complaints.

33. On or about February 11, 2017, Plaintiff was at her desk when security officer White asked her if he could use her desk phone.  Plaintiff allowed him use of the phone.  After he was finished, Mr. White stated into his walkie talkie to another guard, **"I don't want to be accused of saying something I didn't say,"** in another effort to ridicule and intimidate Plaintiff.

34. That same day, Mr. White and another guard were walking by Plaintiff as she walked towards the restroom.  Mr. White held the door for her before the other officer said, **"I thought she was pretty, but she really looks like a dog."**

35. When Plaintiff returned to her desk, a female security guard stood by the doors and yelled out towards the hallway, **"Is that the girl y'all are talking about?!"**

36. A male security guard walked in the hallway past Plaintiff's desk and said in an effeminate voice, **"Stop making fun of my weave."** Later, Plaintiff overheard a comment stating, **"[Plaintiff] is messing with people's livelihoods.  She's messing with my money."**

37. In or around the beginning of February 2017, in an effort to show her employer that the harassment was compromising her health, Plaintiff gave Ms. Curran a doctor's note setting forth her mental health treatment and the reasons for her absences.  Ms. Curran told Plaintiff that a doctor's note was not necessary because she did not take off three days in a row.

38. However, on or about February 15, 2017, Ms. Curran and Ms. McCrillis gave Plaintiff a Performance Management and Corrective Action booklet for her alleged excessive absences irrespective of Plaintiff's doctor's note.

39. On or about February 16, 2017, Plaintiff contacted Ms. Taveras to inform her of additional harassing comments made by the security guards and the maintenance employees.  Ms. Taveras

6

told Plaintiff there was little she could do because she did not know the names of the employees harassing her.  In addition, Plaintiff mentioned her concerns that management would retaliate against her because of her complaints, especially in light of her meeting with Ms. Curran and Ms. McCrillis regarding excessive absences.  Ms. Taveras dismissively said there was nothing to worry about.

40. In addition, Plaintiff asked why management did not file her doctor's note.  Ms. Taveras replied that it was not necessary.  Plaintiff then asked Ms. Taveras what Plaintiff's rights were as a complainant of harassment in the workplace.  Ms. Taveras replied that she didn't understand the question.

41. The same day, Plaintiff called Defendant's Internal Audit Compliance and Risk Management department to file a report.  Plaintiff felt that her complaints were not being properly handled and that the harassment and retaliation had intensified.  Plaintiff also requested a transfer to another position at another NYU location.

42. On or about February 16, 2017, after being informed of Plaintiff's complaint to Internal Audit Compliance and Risk Management, Ms. Taveras immediately retaliated against Plaintiff and placed Plaintiff on mandated unpaid sick leave effective February 15, 2017.  Plaintiff was told that she could not return to work unless she met with a therapist assigned by Defendant and the therapist approved Plaintiff's return to work.

43. Ms. Taveras removed Plaintiff from the workplace in retaliation for escalating the discrimination complaints and in order to discriminate against Plaintiff because of her anxiety, depression, and Spasmodic Dysphonia.  Ms. Taveras believed that Plaintiff's depression, anxiety, and voice disorder made her unfit to work.

44. Later that day, Ms. Taveras called Plaintiff and gave her the contact information for Defendant's assigned therapist, Lacquita McNickles.

45. Plaintiff later emailed Ms. Taveras asking for documentation regarding their discussions about Plaintiff's harassment complaint and the mandated sick leave. Ms. Taveras replied that she did not understand the request and refused to provide any documentation.

46. On or about February 17, 2017, Lacquita McNickles from Corporate Counseling and Associates, a third-party clinical administrator, contacted Plaintiff to ask her health-related questions.  Ms. McNickles scheduled Plaintiff for a therapy session on Wednesday, February 22, 2017.  Plaintiff decided to speak to her own therapist first before going forward with the appointment with Ms. McNickles.  Therefore, she canceled the appointment with the intent of rescheduling in the near future.

47. On or about February 22, 2017, Plaintiff received an email from Ms. Curran that another employee was scheduled to work Plaintiff's shift during Plaintiff's sick leave.

48. On or about February 24, 2017, Plaintiff was contacted by Kathleen Pecina from Employee Labor and Relations.  Ms. Pecina told Plaintiff that she was noncompliant with Corporate Counseling and Associates.  Plaintiff explained to Ms. Pecina that she wanted to speak with her own therapist, Dr. Dinelly Holder, before she met with Ms. McNickles.  Ms. Pecina told Plaintiff that she had two weeks to reschedule the appointment with Ms. McNickles.

49. On or about March 8, 2017, Plaintiff went to her scheduled therapy session with Ms. McNickles.  Plaintiff told Ms. McNickles that she has Spasmodic Dysphonia, a nerve condition that causes the muscles in her throat to contract and spasm involuntarily which affects Plaintiff's voice, especially when she is stressed or anxious.  During the session, Plaintiff mentioned several incidents of the ongoing harassment.  After the session, Ms. McNickles

stated that she did not know what to do going forward and would need to speak to her supervisor.

50. A few days later, Ms. McNickles called Plaintiff's therapist, Dr. Holder, to discuss Plaintiff's mental health.  Ms. McNickles asked Dr. Holder if Plaintiff was "delusional" or suffered from hallucinations.  Dr. Holder told Ms. McNickles that Plaintiff suffered from depression and anxiety and did not suffer from hallucinations.  Dr. Holder stated that Plaintiff's anxiety levels would improve if Plaintiff was moved away from her harassers.

51. Both Dr. Holder and Ms. McNickles stated that Plaintiff was capable of performing her job duties.

52. Nevertheless, Defendant once again tried to force Plaintiff to see another mental health evaluator to fit Defendant's narrative that Plaintiff was "delusional" and prevent her from returning to work.

53. Defendant NYU tried to falsely portray Plaintiff as delusional in retaliation for her discrimination complaints and to further discriminate against her because she suffers from anxiety, depression, and Spasmodic Dysphonia.

54. On or about March 13, 2017, at the behest of Defendant, Ms. McNickles called Plaintiff to recommend that she see a psychiatrist and receive a mental health evaluation.  Ms. McNickles stated that Plaintiff could see a psychiatrist of her choosing but that Ms. McNickles would try to refer Plaintiff to a psychiatrist that accepted Plaintiff's insurance.

55. On or about April 5, 2017, Ms. McNickles called Plaintiff with the contact information of a psychiatrist that would accept Plaintiff's insurance.  Ms. McNickles further stated that Plaintiff was medically cleared to return to work but should make an appointment with a psychiatrist.

9

Plaintiff asked Ms. McNickles if she would be transferred to another position at NYU.  Ms. McNickles replied that it was up to Defendant's Human Resources department.

56. Later that day, Plaintiff called Ms. Pecina to ask her about returning to work and being transferred to a new position.  Ms. Pecina stated that she did not receive any notice about Plaintiff returning to work.  Ms. Pecina further explained that the medical library was not within her jurisdiction and Plaintiff would have to speak with Evelyn Taveras.  Plaintiff left a message for Ms. Taveras, but never received a call back from her.

57. Plaintiff subsequently called Ms. McNickles and told her that Ms. Pecina never received notice of Plaintiff's return to work.  Ms. McNickles stated that that was strange because they primarily worked with Ms. Pecina regarding Plaintiff's paperwork.  Ms. McNickles further stated that her supervisor spoke to Ms. Taveras about Plaintiff's return to work.  Ms. McNickles told Plaintiff that Jay Sandys, Vice President of EAP Operations and Clinical Services at Corporate Counseling and Associates, would be contacting Plaintiff shortly.

58. Thereafter, Plaintiff spoke to Mr. Sandys via telephone.  Mr. Sandys told Plaintiff that her employer had concerns about her mental health and insinuated that Plaintiff was delusional. He stated that although she had a therapist and had already met with Ms. McNickles, he wanted her to see a psychiatrist so her employer "would get to know her really well."  Plaintiff asked Mr. Sandys if Ms. Taveras watched the security cameras around her desk to corroborate her allegations and also asked whether she would be transferred to another position when she returned to work.  Mr. Sandys did not have an answer to either question.

59. Later that day, Mr. Sandys called Plaintiff again and said that he had spoken to Ms. Taveras. Ms. Taveras stated that she completed the investigation months ago and will not be opening it

up again.  Ms. Taveras further admitted that she did not watch the security footage, nor did she do a photo lineup of Defendant's security officers with Plaintiff.

60. Mr. Sandys further told Plaintiff that Defendant had scheduled an appointment for Plaintiff with psychiatrist, Dr. David Kreditor.  Defendant scheduled the appointment for Plaintiff without consulting her and without allowing her to choose her own psychiatrist.

61. Based on Plaintiff's prior experience with Ms. McNickles and Defendant's refusal to allow Plaintiff to return to work, obtain a transfer, or even investigate Plaintiff's complaints of harassment, Plaintiff cancelled her appointment with Dr. Kreditor and opted to see an impartial psychiatrist of her own choosing.  Accordingly, Plaintiff scheduled an appointment with Dr. Mitchell Rubenstein.  Dr. Rubenstein did not view Plaintiff as being "delusional" and did not find any basis for Defendant's mandated leave.

62. Nevertheless, on or about April 11, 2017, Plaintiff received a letter from Ms. Taveras notifying Plaintiff that she was being terminated because she was "no longer compliant with [Defendant's] directive," because she cancelled her appointment with Dr. Kreditor, Defendant's preferred psychiatrist.  In her letter, Ms. Taveras also dishonestly described Plaintiff's harassment claims as being limited to comments about Plaintiff's hair, rather than detailing the full scope of Plaintiff's complaint, including her allegations of sexual harassment.

63. Defendant would not have retaliated against Plaintiff but for her complaints of harassment.

64. Defendant terminated Plaintiff because of her opposition to its unlawful employment practices.

65. Defendant terminated Plaintiff because of her disability and/or perceived disability.

66. Defendant would not have harassed Plaintiff but for her sex/gender, race, and disability and/or perceived disability.

67. As a result of Defendant's actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

68. As a result of Defendant's discriminatory and intolerable treatment of Plaintiff, she suffered and continues to suffer severe emotional distress and physical ailments.

69. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation which such employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

70. As Defendant's conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages as against the Defendant.

**AS A FIRST CAUSE OF ACTION**
**UNDER TITLE VII**
**<u>DISCRIMINATION</u>**

71. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

72. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq., as amended, for relief based upon the unlawful employment practices of Defendant NYU.  Plaintiff complains of Defendant's violation of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's sex and race.

73. Defendant NYU engaged in unlawful employment practices prohibited by Title VII by discriminating against Plaintiff because of her race and sex/gender, together with sexual harassment and creating a hostile work environment.

## AS A SECOND CAUSE OF ACTION
## UNDER TITLE VII
## RETALIATION

74. Plaintiff repeats, reiterates and realleges each and every allegation made in the above

paragraphs of this Complaint as if more fully set forth herein at length.

75. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2(a) provides that it

shall be an unlawful employment practice for an employer:

> "(1) to … discriminate against any of his employees … because he has
> opposed any practice made an unlawful employment practice by this
> subchapter, or because he has made a charge, testified, assisted or
> participated in any manner in an investigation, proceeding, or hearing under
> this subchapter."

76. Defendant NYU engaged in an unlawful employment practice prohibited by 42 U.S.C. §2000e

et seq. by discriminating against Plaintiff with respect to the terms, conditions, or privileges of

employment because of her opposition to the unlawful employment practices of Defendant,

including but not limited to, terminating Plaintiff's employment.


## AS A THIRD CAUSE OF ACTION
## AMERICANS WITH DISABILITIES ACT ("ADA")
## DISCRIMINATION

77. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs

of this Complaint as if more fully set forth herein at length.

78. Plaintiff claims the Defendant violated Titles I and V of the Americans with Disabilities Act

of 1990, as amended, 42 U.S.C. § 12101 et seq.  Section 12112 specifically states:

> General rule. - No covered entity shall discriminate against a qualified individual
> with a disability because of the disability of such individual in regard to job
> application procedures, the hiring, advancement, or discharge of employees,
> employee compensation, job training, and other terms, conditions, and privileges
> of employment.

13

79. Defendant NYU engaged in unlawful employment practices prohibited by the ADA by discriminating against Plaintiff because of her disability and/or perceived disability, including but not limited to, terminating her employment.

## AS A FOURTH CAUSE OF ACTION
## UNDER STATE LAW
## DISCRIMINATION

80. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

81. Executive Law § 296 provides that "1. It shall be an unlawful discriminatory practice: "(a) For an employer or licensing agency, because of an individual's race . . . sex…disability and/or perceived disability to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

82. Defendant engaged in an unlawful discriminatory practice by discriminating against the Plaintiff because of her disability and/or perceived disability, race, and sex/gender, together with sexual harassment, creating a hostile work environment, and unlawful termination.

83. Plaintiff hereby makes a claim against Defendant under all of the applicable paragraphs of Executive Law Section 296.

## AS A FIFTH CAUSE OF ACTION
## UNDER STATE LAW
## RETALIATION

84. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

85. New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice:

> "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because [s]he has opposed any practices forbidden under this article."

86. Defendant engaged in an unlawful discriminatory practice by discharging, retaliating, and otherwise discriminating against the Plaintiff because of Plaintiff's opposition to her employer's unlawful employment practices.

## AS A SIXTH CAUSE OF ACTION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
## DISCRIMINATION

87. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

88. The Administrative Code of City of NY § 8-107 [1] provides that "It shall be an unlawful discriminatory practice: "(a) For an employer or an employee or agent thereof, because of the actual or perceived gender . . .race…disability… of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

89. Defendant engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(1)(a) by creating and maintaining discriminatory working conditions, and otherwise discriminating against the Plaintiff because of her disability and/or perceived disability, race, and sex/gender, together with sexual harassment, creating a hostile work environment, and unlawful termination.

## AS A SEVENTH CAUSE OF ACTION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
## <u>RETALIATION</u>

90. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs

of this Complaint as if more fully set forth herein at length.

91. New York City Administrative Code Title 8-107(7) provides that:

> "It shall be unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter…"

92. Defendant engaged in an unlawful and discriminatory practice by retaliating against the

Plaintiff, including but not limited to, terminating Plaintiff's employment.


**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendant:

A. Declaring that the Defendant engaged in unlawful employment practices prohibited by Title VII,

the ADA, the New York Executive Law, and the Administrative Code of the City of New York;

and that the Defendant harassed and discriminated against Plaintiff on the basis of her disability

and/or perceived disability, race, and sex/gender, together with sexual harassment, creating a

hostile work environment, retaliation, and unlawful termination;

B. Awarding damages to the Plaintiff, retroactive to the date of her actual discharge, for all lost wages

and benefits resulting from Defendant's unlawful employment practices;

C. Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress,

pain and suffering and injury to her reputation;

D. Awarding Plaintiff punitive damages;

E.   Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action;

F.   Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendant's unlawful employment practices.

**JURY DEMAND**

Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff demands judgment against Defendant in an amount to be determined at the time of trial plus interest, punitive damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

Dated:  New York, New York
       July 20, 2018

                                           **PHILLIPS & ASSOCIATES, PLLC**
                                           *Attorneys for Plaintiff*

                         By:   _____/s/_____
                                     Erica L. Shnayder, Esq.
                                     45 Broadway, Suite 620
                                     New York, NY 10006
                                     (212) 248-7431